Good morning, Scott Splitgerber for Defendant Georgiou. I'd like to reserve three minutes for rebuttal. That's granted. In this case, each count of conviction could have rested solely on the extraterritorial application of U.S. law. I think it's now uncontroversial that the presumption against extraterritoriality applies to all statutes, whether civil or criminal. The Supreme Court has stated that both Section 10b of the Securities Exchange Act and the Wire Fraud Act are silent as to extraterritoriality. Morrison interpreted Section 10b not to apply extraterritorially. The question of whether the Wire Fraud statute can apply extraterritorially is still open. It has insinuated that it may apply extraterritorially in the sense that the Second Circuit applies it as kind of a derivative sort of extraterritorial application. Are you talking about the Villar case? Yeah. No, I'm talking in that case, Pasquimitino cites to Pierce and, you know, that rests also on the Trepillo case in the Second Circuit where they found it can apply extraterritorially, but one element that has to be proven in addition to the jurisdictional element is the element of the scheme to defraud. So the Pasquimitino court referred to Pierce where that element was not proved because the government failed to prove that the actual scheme to defraud was illegal under the foreign law. So could we go, I mean, to Morrison and look, the first prong deals with the purchase or sale of a security listed on an American stock exchange. Did that occur in this case? It did not. Okay. How do you deal with the SEC v. Facetto case, which the government puts a lot of emphasis on? Well, I think in that case, the district court in California confuses the ability of a government to prosecute fraud that affects the domestic market with the question of how you prove the domestic aspect of that fraud. Basically, it's confusing jurisdiction to address the merits of the case. The Supreme Court has drawn a bright line. Those transactions that take place on a national exchange. Well, let me ask you, why shouldn't securities traded on an OTC market and on a national security exchange be treated the same under 10B? Well, there are a few different reasons. One of the reasons is, is contrary to the text of the statute and the decision in Morrison, the government primarily rests its theory on that. But the OTC, as pointed out in our briefs, that's contrary to what the court was trying to get in Morrison, a bright line test. It's these transactions on the national exchange. There, there's no dispute where the irrevocable liability takes place because it happens on the exchange. Just to point out, that is not how it works in the OTCP or Pinching. I would refer the court to maybe FINRA's understanding. But why, what's the problem with the jury ultimately making a determination as to where irrevocable liability occurs on an over-the-counter transaction? It can make that determination, but the determination is different. The government would have to show where a specific transaction, where that took place. Here, the government tries to fudge that by just saying it affects the market. In Morrison, the court said it's not enough that it affects the market on it or that it's necessary to protect the domestic consumer. What's the quantum of proof required, right? Is it, they have to, they have to have shown or put into evidence for the jury to infer one transaction? What is it? Well, I think we need to look at that a few different ways because there are several theories that they advance. Now, you're asking under the government's market manipulation theory. Well, let's, let's look at prong two of Morrison, right? And let, let me take a step back and ask a more basic question that gets away from the proof, right? So, under the second prong of Morrison, we look at the purchase and sale of stock in the United States, right? So would you agree that there's proof in the record of at least one purchase and or sale of stock in the United States? I agree that there is evidence in the record of sale or purchase of a security for a couple of accounts, and that has to deal with Kevin Walzer. That's for the Avicenna and the Neutron. Now this all goes into a harmless error argument because initially the government listed many different types of transactions, many of which could have been exclusively relied on that were foreign. But, but isn't that, isn't that not important for our purposes? I mean, our purposes, we're not here to say there were, I'm just making numbers up for a moment, there were a thousand transactions and, you know, 500 of them qualified as within the United States and 500 didn't, right? I mean, the, the, the threshold in reviewing a verdict here is much different, right? I mean, we're, we're not, there's no quantum for us to look at other than, okay, there are transactions in the United States or they're not, no? I, I disagree. I think that there are several theories advanced and we look at going back to the skilling cases and things like that. If you have a theory, which we set out here, is the margin borrowing theories, which was promoted by the government for each one of these counts. You have securities transaction based on margin accounts in the Bahamas. That is an invalid theory. That alone should send this case back. However, under an alternative theory, even there, you do not have domestic purchases for each one of the securities transactions. Don't, aren't, aren't the, all of the transactions that run through the market makers, transactions that are in the United States? No. Many market makers are in Canada. And in fact, if you look at, but some, but there are market makers in the United States. Some. Yes, you're correct. There are some, but not ones pointed out to the jury by the government. You can't just, that is a conduct and effects test. You can't just say that because there was some transaction out there that the jury didn't consider that you now have overwhelming or, you know, beyond a reasonable doubt, proof of a violation of section 10b for that count. Yeah, but as Judge Greenaway says, I mean, we're a reviewing court. We've got to see if there's any evidence that would support a jury's verdict in these things. You're saying, well, some of the, some of the evidence is no good, but you know, some of it is good. Aren't we really, I mean, we're sort of limited in the way we can view it. Just because you may be able to refute some of it, the other stuff would support the jury's verdict, wouldn't it? Well, I think you're limited. The domestic, the domestic. I think you're limited to what the, what the jury had before it, whether it had a basis to find beyond a reasonable doubt. And I think if we look at, at the Villar case, there it's very clear. The court found that Morrison was violated. It found harmless error because on each of the two counts of securities fraud, there was a single theory. There was one with, you know, the deposits that went to the, to the Caribbean. And there was one that was a straight misrepresentation to Ms. Case. If the government proposes alternate theories and there is evidence to support, however the number is, one of the two, or if there are more than two, one of the however many, and there is a quantum of evidence to support that, as a reviewing court, aren't we, aren't our hands bound to affirm that? I think not. Because where you have multiple theories, one which is plainly invalid, the theory that these convictions could have all rested on margin borrowing counts. This is the inverse of the count in Villar dealing with Lily Case. There, it was clear she was in the United States. She was the one who the misrepresentations were made to. She was the one defrauded. In this case, every single one of those deals with brokerage in the Caribbean. This is a concern that the Supreme Court had in Morrison when it said that other countries regulate their securities industry differently. It's cited to the amici brief from many of those countries. It pointed out that they can do what they want. And the baseline prior to 10B was caveat emptor. That is what people do in the Caribbean. That's why you have offshore accounts. I see I'm running low on time. Would you like me to continue? Would you like me to address wire fraud? You can continue. Essentially what the government is doing is making a quotation theory. Because these securities are quoted on the OTCBB or the pink sheets, they're liking it to a sort of listing theory that was rejected. I mean, another reason why the Faiseto decision is wrong is because just looking at how FINRA views the issue, Financial Industry Regulatory Authority, it states the OTCBB and pink sheets are quotation medians for broker-dealers. They contain quotations for thousands of over-the-counter stocks not listed on any major stock markets. Neither the OTCBB nor the pink sheet is an issuer, listing service, or a stock market. So that goes more to the first prong. Yes, to the first prong. Okay. And let me ask you a question that goes to the second prong. The government says in its supplemental brief that there's evidence of U.S. transactions in each of the target stocks. If that's so, then doesn't it fall within the ambit of 10B? It would be so if it were true and if it were for transactions brought to the jury's attention. But if you look closely at that, all it is is a re-articulation of its conduct and effects type test. The courts have consistently stated that just because you have an agent or a custodian of money or, you know, the securities IDs, that does not bring it within the ambit of  What do you mean if it was before the jury? Do you mean that they met... They advance theories to the jury. Well, are you saying what they mentioned in their supplemental brief... Yes. ...is opposed to the jury? No, they're just saying that... Well, let me take a look at exactly what they present in their supplemental appendix. Well, you're just about out of time. Why don't you take a look at it at a council table and then under your butthole, you can bring it up, okay? Thank you very much. Yeah, yeah, no. Consider it, okay? Thank you. Thank you. We'll hear from the government. Good morning, Your Honor. May it please the Court. Lou Lappin for the government. I want to start with the standard of review here, which I know Your Honors are familiar with, but it really provides a context for everything that we've been discussing. And this is on plain error review. Defendants did not raise this issue until appeal. And so now what Your Honors have to determine is, is there plain error based on a case that wasn't decided at the time of trial? And was there a fundamental miscarriage of justice? And there absolutely was not. And part of what we're hearing from the defense, and it's been a theme throughout the briefing in this case on appeal, is a complete misunderstanding of what this case is about. Defendant wants to make this case about a narrow single transaction or two that occurred in the Bahamas, when what was presented to the jury and is part of a record is overwhelmingly a series of stock manipulations and securities frauds in four different stocks. And those stock manipulations involved a fraud on the entire market for those stocks in the United States. Now there are foreign victims of that fraud, as well as numerous United States victims. But just because there are foreign victims of a fraud doesn't make an American securities fraud, a mail fraud, suddenly become an improper extraterritorial application of United States law. In your supplemental brief, you asserted that with regard to prong one of Morrison, we had to essentially analogize the OTC market to a national security exchange. Let me ask you this. If we don't, I presume you just go to prong two and say, well, we went on prong two, clearly applying the plain error analysis. That is 100% correct. But we also went on prong one. And on prong one, under the Fichetto case, as Your Honor pointed out, that's the one case to squarely address the question. The Morrison case says, and I'm quoting, the purchase or sale of a security listed on an American stock exchange. That seems pretty bright for a bright line. Fichetto, doesn't it kind of muddy that line a little bit and said, well, not necessarily listed on it. It could be something else. Well, Morrison only addressed the issue arising out of a stock that was on a foreign exchange. And it's clear when one reads the opinion that the focus of the Morrison court was on distinguishing between transactions on a domestic exchange with transactions on a foreign exchange. And all of the analysis in that opinion that goes to the first prong entirely 100% supports the conclusion that 10b-5 also should apply to the over-the-counter markets, starting with the purpose of the Exchange Act. And the theory is textually based. But that's all dicta, right? Well, it says we're analyzing the language of the statute here and deciding whether this should apply to the United States or elsewhere. And it says to provide for the regulation of securities in over-the-counter markets and to prevent unfair practices in those exchanges and markets. And then it says that the over-the-counter markets are affected with a national public interest, which is exactly what the court was focused on when it then concluded, right after citing to those statements from the prologue, nothing suggests that this national public interest pertains to transactions conducted upon foreign exchanges and markets. So that was the focus of Morrison. And all of that analysis supports the fact that especially in a market manipulation case, that there are United States interests when that market manipulation is on a U.S. market, even if it's not an exchange. And that was, again, that's the theory of the case, that he is creating, the defendant, an entirely false and manipulated market for these stocks so that that fraud absolutely affects the United States and it should come under the first prong. Well, now, isn't your better argument the second prong? I think the second prong is an easier argument. Isn't that just an easier way? It's an easier argument. It is absolutely an easier argument. My friends from the SEC would like us to win the first argument. Those are our friends. I understand. And we should, because this issue is going to come up again and again. And I think it's very, very clear, while it's more of a complex legal analysis, I do think it's very clear that the entire reasoning of Morrison supports, as is articulated in Fichetto, our analysis. But I'll move to the second prong because it is easier. Okay. So let me ask you this question. Is the location of the market makers and the transactions that they create critical to the analysis of whether it falls within 10b or not? Well, it's not the only – it's not the only evidence that we have. I understand it's not dispositive, but is it critical to the determination of whether it falls within 10b? I think it strongly supports our position, but it's not the only thing that does. So that these transactions, when we look at absolute activist and some of the cases that followed, they say look to where irrevocable liability is incurred, where title transfers, where there's a commitment between a buyer and a seller, where money is exchanged, all these kinds of activities that relate to the transaction that show where a transaction occurs is what we should look at in determining whether we satisfy the second prong. So technically, do we only need to find – well, not find, but yeah, I guess find – only one transaction that could be designated as within the United States with regard to each target stock to a firm? I believe that would be enough, but this case has so many transactions that I don't believe Your Honor has to conclude we have found one transaction. There are so many, but one would suffice. And we start with the fact that all these stocks are traded on the over-the-counter markets in the United States, and as our witness, Mr. Koster, explained, those transactions are completed there through market makers. And we just pulled out four examples that matched up with transactions that he discussed that include some of the transactions that the defense would point to to say they were purely foreign. And what we see is American market makers buying up the stock and then selling it. And so under any analysis, just that evidence alone, which is part of the record in the case, establishes that these transactions occurred in the United States. I think your adversary argues, perhaps citing our signed case, that if the legal theory is invalid, the proper remedy is vacate. What's your position? Well, there is – in other words – well, I think that also is a position that the defendant takes that is – doesn't accurately reflect the evidence and the theory at trial. Defendant keeps saying there were two different theories that we presented to the jury on which they could convict. A legally valid one, perhaps, and a legally invalid one. That's not true at all. This is not a case that had two separate theories. It's a case that there was, as presented throughout the trial, there was extensive market manipulation by the defendant in these four stocks. And then the defendant profited on that market manipulation in two different ways. He sold the stocks and profited, and he sold the stocks to these foreign brokerages, got loans from them, bought and sold stocks based on that. Those weren't two separate theories. It was all one theory of a fraudulent securities fraud and a mail fraud. And the jury returned a general verdict, right? And the jury returned a general verdict. That is true. So to get back to these other transactions, if I may, just briefly, again, throughout the trial, if we look at all those Avicenna transactions that involve the defendant getting 21 million free trading shares directly from the company, that occurs in California. Additional financing where he gets more stock occurs in California. The transactions happen there. And then involving Caledonia, which is one of the foreign victims, there are 1.69 million shares that are delivered from the United States. So to ever even talk about this as even possible that this case involved one or two United States transactions doesn't begin to capture the case. The other foreign victim is Avicenna. Everything with, I'm sorry, with AccuVest, everything with AccuVest was run through its affiliate in California, William Wright. Brad Jensen testified about that at trial. All of the transactions, all of the stocks, the northern ethanol shares, the HiHi shares, all of those stocks were sent to California. And then that victim, as well as Caledonia, were trading back into the American over-the-counter markets in these stocks in furtherance of the stock fraud and the wire fraud. So that there's an endless cycle of United States activity in this case. And one cannot separate the foreign activity from the United States activity. It's all of one piece. And even if, even if the defendant was correct that there were two different theories here and this was a general verdict under Vilar and the Ninth Circuit Chan-Fo case, it's absolutely a harmless error. And in this case, it would be plain error. The defendant can't show that the jury would have reached a different verdict if it had been instructed differently because of the overwhelming nature of the evidence. On, I'll jump to wire fraud because the defendant hasn't, can't possibly show that these wire fraud convictions are extraterritorial. Morrison says explicitly that there are two different cases. That we're looking at the focus of a statute to determine whether it applies extraterritorially. And for wire fraud, unlike securities fraud where the focus is on the transaction, wire fraud, the focus is on the scheme. The scheme to defraud and the wiring and furtherance of that. And that scheme is complete when it's executed in the United States. And in this case, for all the reasons that we discussed under the second prong and throughout our briefing, the, Giorgio's wire fraud schemes against Caledonia and against Acuvest and William Wright, all of those frauds are completed in the United States. Lots and lots of activity in the United States, transactions and otherwise that are going on there. So, there is simply no way that he can take his theory on securities fraud and transfer it to wire fraud in this case. And furthermore, there's no need for this court to ever have to interpret foreign law in determining whether Caledonia or William Wright and Acuvest were should have been instructed on foreign law so they could determine whether or not there was a property right that these victims were deprived of. And in Pasquantino, where there was that issue because the question was whether the Canadian government was entitled to collect the taxes that it was alleged to be defrauded of, there's no such issue here. This is a few, your adversary points to Pasquantino in note 13 for the proposition that you must have proof of illegality in the foreign jurisdiction. That's what you're addressing, right? That's what I'm addressing. But Pasquantino says that that arises in some cases you would need proof of that illegality. And Pasquantino and the Pierce case are perfect examples of that because in those cases there's an issue of what the property right is at stake. Here, to make it as simple as possible and to accurately reflect the nature of this case, this is just a straight out theft. It's a theft through securities. So following the analysis route, Caledonia and AccuVest clearly had a property right to their own money. Exactly. Property right to their own assets. There's no issue as to that. And they're charged with, and the government charges the defendant with depriving Caledonia and AccuVest of money or property. And that's exactly what they were deprived of. So you never have to reach that. Judge Vinesky may have asked this. I thought to your adversary, maybe it was to you, on Absolute Activist, do we need to adopt that irrevocable liability test? No, I don't think you need to adopt that. While we agree that Morrison does apply to criminal cases, these other cases that have followed it that try to come up with a precise standard to show when a transaction has occurred in the United States, typically arise in the civil context where there's a plaintiff suing a defendant and a single solitary transaction that's a series of transactions very narrowly construed that are at issue. We have a huge securities fraud scheme on the market. So there's lots of transactions that occur there. And I think you can see that much more broadly and come up with something that can be broader that clearly would cover those transactions all existing in the United States. And Absolute Activist identifies a number of possible ways that one can even interpret irrevocable liability incurring and the transfer of title. And they say including but not limited to. So I think that there's a lot of different ways that we can skin that cat. And without any doubt, when we look at this case, we're looking at a massive United States stock fraud scheme that has some foreign victims. And for the defense to step up here and say that was the extraterritorial application of U.S. law and the district court committed plain error and there was a miscarriage of justice because the defendant was convicted of these American crimes, that's outrageous. And it would be a miscarriage of justice respectfully if this case were reversed on any of those theories presented by the defense. Counselor, just one last thing. Just so we can be clear, the government is not arguing that Morrison, the government agrees that Morrison applies to criminal acts. Correct. We agree with that. Thank you. Thank you. Thank you, Counselor. First, to respond to Judge Greenaway's point about Absolute Activist. The government kind of throws away a lot saying that Absolute Activist shouldn't be applied because then they lose much of their theories about conduct and where market makers are. Valar focuses more on where the participants were when the actual transactions were ordered. These people were in Canada, Bahamas. One was in the United States, the government's key witness, Kevin Walser. With regard to their new evidence in their supplemental appendix, Government Exhibit 300 is the voluminous documents that were allegedly summarized by Mr. Koster. There is no way the jury could comb through that to find some sort of high-high transaction on the U.S. market that wasn't pointed out to it. The indictment does not show any such transactions. The indictment shows high-high transactions that are foreign. Those are the ones that Koster focused on. I don't understand something. In all of the quantum of evidence that the government put before the jury, I mean, anyone could say, well, if you look at this, if you look at that, it's the totality of the evidence. And as it happens, the – you said 300. I mean, what are you talking about? 305 is the exhibit that was – Are you talking about the trade analysis? 305 is supposed to be the summary of 300. 300 is boxes and boxes of printouts. Yeah, yeah, yeah. 305 does not look at any U.S. transactions for high-high or Northern ethanol. It does look at transactions that can be construed as domestic for Avancina and Neutron. Those are linked to the cooperating witness, Walzer. Look at the indictment and that exhibit. But isn't that enough? Isn't that enough? No. There is a count of each stock. He's convicted on four counts. If it was just one securities fraud count, that would probably be sufficient. Here, there's a count for each separate security. So on each one of those, there are multiple theories. I mean, there are private placements and things like that. The government relies solely on its market manipulation theory. So you're conceding on two, but not on the other two? I'm conceding that if you look under harmless error analysis, under Valar, those two securities would meet the Valar test. But my point is that you can't find harmless error because of the multiple theories. There was only one theory for each stock in Valar. You're talking about plain error, right? You said harmless error. Yes, plain error. I'm sorry. I'm speaking of plain error. We got it. Yes. Under that, it would be a violation of his substantial rights and the integrity of the judicial proceeding. All right. Thank you, counsel. Thank you. Again, as in the first case, we've delimited argument here. But rest assured, we considered your briefs, all the arguments. They were excellent, as were your arguments here today. Thank you. We'll take